# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| SUSAN L. LONG, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
|   vs. | ) Cause No. 1:12-cv-239-WTL-MJD |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
|        Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Susan L. Long requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court rules as follows.

## I.    PROCEDURAL HISTORY

On March 27, 2008, Long filed an application for SSI alleging disability beginning January 1, 1998. Long's application was denied initially on July 24, 2008, and again on reconsideration on October 2, 2008. Thereafter, Long requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on July 15, 2010, before ALJ Stephen Davis in Indianapolis, Indiana. During the hearing, Long testified and Long's counsel made a brief statement. On October 15, 2010, the ALJ denied Long's claim. The Appeals Council denied review on November 28, 2011. This timely action for judicial review ensued.

## II.     EVIDENCE OF RECORD

In May 2006, while riding her bicycle, Long was involved in an accident with a pickup truck and dragged for some distance. She suffered a spinal fracture and underwent emergency surgery.

On September 7, 2007, Long saw a doctor regarding two warts on her hands; treatment of the warts was completed. During this visit, the doctor also noted that Long had an active pituitary tumor. The doctor prescribed a pituitary MRI to be completed before Long's next visit.

On October 10, 2007, a radiology impression noted a mass in Long's pituitary fossa extending and invading the left cavernous sinus and surrounding the left internal carotid artery. Doctors conjectured that the mass might be a meningioma, pituitary adenoma, or a chondroid tumor.

On November 7, 2007, Long saw Dr. Jason Voorhies, who reviewed the status of Long's hormone levels in light her pituitary tumor. He opined that surgery would be a treatment option, but that it would be difficult to completely resect the tumor, given the fact that it invaded the cavernous sinus and wrapped around the carotid artery. He opined that surgery would be a "debulking" exercise, not a curative exercise. He concluded: "definitely it is necessary to do something to treat this tumor to prevent the possibility of cardiac complications from elevated growth hormone in the long term."

On March 17, 2008, Long was examined in the Neurology Clinic at Wishard Memorial Hospital. Dr. Daniel Kim recommended surgery to debulk Long's pituitary tumor. Long was described as tearful and asked to think about surgery for a month.

Thereafter, during an appointment for an unrelated health concern, on May 7, 2008, Dr. Klaus Hilgarth noted diagnoses including pituitary tumor, lower back pain, and insomnia.

On May 21, 2008, Long's live-in boyfriend, Robert Wilkins, completed a RFC questionnaire. Wilkins indicated that Long often had headaches and light sensitivity; she rarely did housework, such as washing the dishes; and she did not do yard work on a regular basis. Wilkins observed that Long forgot when she needed to take her medications, and she had lost money at times. When asked to identify her functional limitations, Wilkins indicated that Long had difficulty lifting, standing, climbing stairs, kneeling, squatting, reaching, using her hands, bending, and getting along with others, but she had no problem dressing, bathing, or caring for her hair. He noted that she could walk for a distance of three to four blocks before needing to rest for two hours.

On May 23, 2008, Long underwent a consultative examination with an SSA-selected nephrologist, Dr. Thomas Alley, who found her to have bilateral carpal tunnel syndrome, fibromyalgia, back trauma, migraine headaches, and an active pituitary tumor. Dr. Alley noted that Long reported light and noise sensitivity. Long also reported chronic leg and back pain, and Dr. Alley indicated that she walked with a limp. Dr. Alley also assessed a decreased range of motion. Dr. Alley concluded that Long "is unable to work as a result of her bilateral carpal tunnel syndrome, her back trauma and resulting radiculopathy in her left lower extremity and the active pituitary adenoma with treatment decisions still pending."

On June 19, 2008, a non-examining state agency physician, Dr. Fernando R. Montoya, completed a physical RFC assessment form. Dr. Montoya opined that Long is limited to light work with occasional postural limitations, except no climbing of ladders, ropes, or scaffolding. He added that she needed to avoid concentrated exposure to noise, vibration, and hazards.

On June 26, 2008, psychologist Dr. Herbert Henry completed a mental status evaluation and administered the Wechsler Memory Scale – Third Edition (WMSIII). In addition to trouble

falling asleep and staying asleep, Long expressed guilt over her divorce and lost pleasure in life. Long scored in the borderline range on immediate, working, and general memory. She also scored "extremely low" in the visual immediate and visual delayed categories. Dr. Henry's diagnoses included depressive and amnestic disorders.

    State agency reviewer Dr. J. Gange completed a mental RFC assessment form on July 22, 2008. The doctor noted that Long was moderately limited in her ability to understand, remember, and carry out detailed instructions and her ability to sustain an ordinary routine without special supervision. Dr. Gange concluded that Long could complete simple, repetitive tasks. Dr. Gange also completed a Psychiatric Review Technique form and found amnestic and depressive disorders causing moderate limitations in concentration, persistence, and pace.

    On August 14, 2009, Long visited a primary care center and was diagnosed with knee pain, acromegaly, and hyperglycemia. Dr. Aaron M. Leary referred Long to endocrinology for initiation of therapy for acromegaly and to ophthalmology for management suggestions for acromegaly and her pituitary tumor.

    On November 10, 2009, endocrinologist Dr. Jeremy R. Grogg noted active diagnoses including knee pain, acromegaly, hyperglycemia, pituitary tumor, neck pain, lower back pain, insomnia, pituitary adenoma, lumbar vertebra fracture, abnormal pituitary fossa, fibromyalgia, numbness, chest pain, carpal tunnel syndrome, sciatica, headache, arthritis, and depression.

    On November 17, 2009, Dr. Hilgarth noted diagnoses including shoulder pain, depression, acromegaly, and esophageal reflux. Following an MRI on December 1, 2009, the doctor noted that Long had an "[u]nchanged ill-defined lesion involving the left aspect of the pituitary gland extending to the left cavernous sinus, likely pituitary adenoma." On December

29, 2009, Dr. Hilgarth examined Long and ordered an echocardiogram and referred Long to neurosurgery for her pituitary tumor.

At the hearing, Long testified that she began to experience problems with her hands and carpal tunnel syndrome in 1998. At that time, she was diagnosed with fibromyalgia. She was forced to cease working as a shoeshiner due to problems with her knuckles, which she described as squishy and swollen.

On May 15, 2009, following an MRI, Long underwent emergency back surgery to treat severe injuries she sustained in a bicycle accident. The MRI revealed a tumor near her carotid artery. Although surgical debulking was considered, Long voiced concerns about the procedure and future recurrence. Doctors also discussed the possibility of future gamma knife radiosurgery.

Currently Long receives food stamps and, after leaving an abusive relationship, resides with her elderly mother and sister. Long testified that she does not wear clothing with little buttons due to her loss of fine manipulative skills; furthermore, she does not bathe as frequently as she would like due to bending and reaching limitations and reduced energy. Long also testified to difficulty maintaining a schedule due to her fluctuation between good and "horrible" days – noting, "[S]ometimes there's a lot of horrible days for consecutive months . . . the good days are getting fewer and fewer."

Long testified that she continues to experience migraines multiple times per week, for which she is prescribed Percocet. She testified that she would be unable to function at a job during one of these episodes. Additionally, she experiences tumor headaches approximately once every three months – producing about three days of convulsive vomiting and requiring four days to recover. Moreover, fibromyalgia pain persists between her shoulder blades, and she

experiences discomfort in her back following standing, leaning, or reaching. Although she has not received any treatment for this pain, she is taking medication.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning ... [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV.  THE ALJ'S DECISION

At step one, the ALJ found that Long had not engaged in substantial gainful activity since March 27, 2008, the application date. At step two, the ALJ concluded that Long had the following severe impairments: pituitary tumor, carpal tunnel syndrome, back pain, and migraines. At step three, the ALJ determined that Long's severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Long had the residual functional capacity ("RFC") to perform light work with the following limitations: Long should avoid concentrated exposure to noise, vibrations, and hazards such as heights and moving machinery and she is limited to work involving simple and repetitive tasks. Given this RFC, and taking into account Long's age, education, and work experience, the ALJ determined at step five that Long could perform her past relevant work as a shoeshiner. The ALJ also found that there were other jobs that exist in significant numbers in the national economy that Long could also

perform. Finally, the ALJ found that Long's additional limitations would not prevent her from performing work at the unskilled light level or unskilled sedentary level, and, as a result, the framework for the Medical-Vocational Guidelines dictated a finding of "not disabled." Accordingly, the ALJ concluded that Long had not been disabled as defined by the Act since March 27, 2008.

## V. DISCUSSION

Long contends that the ALJ made a number of errors in denying her claim. The Court addresses each argument in turn below.

### A. Long's Subjective Complaints of Pain and Limitations

Long asserts that the ALJ erred when he discounted her subjective complaints of pain and functional limitations because he found her testimony incredible.

First, the ALJ discounted Long's credibility because she has refused to undergo debulking surgery of her pituitary tumor. The regulations recognized that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p. Here, however, the ALJ failed to consider why Long may have decided to forgo surgery.[1] Noting that the Commissioner can deny benefits if a claimant fails without good cause to follow proscribed treatment, the ALJ failed to inquire into whether Long had "good cause." Rather, the ALJ concluded simply that "the failure of the claimant to seek examination and treatment for the condition reflects poorly on the credibility of the claimant." It

---

[1] Contrary to the Commissioner's assertion, Long testified at the hearing to some reasons why she had not yet undergone surgery: "Well, [the tumor] is around my carotid artery which makes it very scary for any kind of removal. All they could do is a debunking and then I've been told that they often grow back. . . . I gathered that if they go in anywhere near your pituitary, they usually just booger it up and then you have to be on a bunch of hormone replacement therapy."

8

was error for the ALJ to ignore reasons why Long might not have elected to go forward with surgery before discrediting her testimony.[2]

Second, Long also contends that it was error for the ALJ to fail to consider that Long's conditions result in a fluctuation of "good" and "bad" days. The Court agrees. Specifically, the ALJ's decision fails to consider the effect of Long's migraines, which condition the ALJ classified as severe. The ALJ concludes that Long's "lack of treatment" and "lack of objective medical evidence" regarding her migraine headaches negatively impacts her credibility as to her assertions of disabling pain from migraines. However, the ALJ ignored that Long has obtained treatment for her migraines: she testified at the hearing that she takes Percocet for the pain. At a minimum, it was error for the ALJ not to inquire further into the effects of Long's migraines.

Third, Long asserts that the ALJ erred when he failed to consider the RFC filled out by Long's former live-in boyfriend, Robert Wilkins. The regulations provide that ALJs must consider eyewitness accounts of the claimant's symptoms, SSR 96-7p, but there is no indication that the ALJ did so in this case. This was error.

### B.  Objective Evidence

Long argues that the ALJ ignored considerable evidence of Long's ongoing impairments and discredited reliable medical reports as not supported by the evidence, when in fact those medical reports are, according to Long, supported by the medical record.

Long contends that it was error for the ALJ to disregard Dr. Alley's opinion that Long was unable to work due to her combination of impairments and decreased range of motion. However, the Court finds no error here. The ALJ noted Dr. Alley's report that Long had no muscle strength deficits and her fine finger movements before concluding that Dr. Alley's

---

[2] In addition, it is unclear to the Court why failing to undergo surgery on her pituitary tumor should affect the credibility of Long's allegations related to other ailments.

opinion is not supported by the record. Likewise, the ALJ compared Dr. Alley's report that Long had a slight limp with Dr. Henry's report that Long "walked without difficulty" before rejecting her claim of back pain with radiculopathy. The ALJ's analysis is supported by substantial evidence.

Long next takes issue with the ALJ's decision to partially credit the assessment of Dr. Montoya. Specifically, Dr. Alley's opinion was rejected in part for inconsistency with Dr. Montoya's report, but the ALJ later rejected the portion of Dr. Montoya's opinion regarding Long's postural limitations as unsupported by the evidence of record or Long's testimony. While Long points to portions of her hearing testimony as evidence of her postural limitations, she has not pointed to any medical record evidence to substantiate her claim. Accordingly, while it was error for the ALJ to discredit Long's testimony on the insufficient analysis described above, it was not error for the ALJ to weigh the absence of objective medical evidence in the record as to Long's postural limitations.

Long also argues that it was error for the ALJ to reject Dr. Gange's assessment that Long suffered from severe amnestic and depressive disorders as not supported by the evidence of record and inconsistent with Dr. Henry's report. According to Long, the error lies in the ALJ's comparison of Gange's mental health assessment with Dr. Henry's limited testing of Long's memory; it is error, Long argues, to conclude that Long does not have serious impairments simply because Dr. Henry only opined that she had memory problems. However, Dr. Henry's report is not so narrow; his report reveals that he discussed Long's feelings, daily living, and social activities with her. It was therefore not error for the ALJ to discredit Dr. Gange's analysis

as inconsistent with the detailed analysis of Dr. Henry;[3] rather, the mental limitations incorporated by the ALJ are supported by substantial evidence.

### C.      Past Relevant Work

The ALJ found that Long could perform her past relevant work as a shoeshiner. That determination was in error, Long contends, because such work requires a greater functional skill set than she possesses. According to Long, shoeshine work requires frequent stooping, reaching, handling, and occasional fingering, but Dr. Montoya specifically limited Long to only occasional stooping, and Long's diagnoses of carpal tunnel syndrome, fibromyalgia, and arthritis would make reaching, handling, and fingering particularly difficult, if not impossible. In light of the fact that the ALJ failed to sufficiently analyze Long's subjective assertions of pain and functional limitations because he discredited her testimony, the Court finds this determination likewise in error. On reexamining Long's allegations of pain, the ALJ should also consider the limitations Long's pain will have on her functional limitations and ability to work.

### VI.     **CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is **REVERSED and REMANDED** for further proceedings consistent with this Entry.

SO ORDERED:     03/05/2013

*/s/ William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[3] Long also argues that it was error for the ALJ to reject Dr. Gange's opinion in light of the fact that Dr. Henry also diagnosed Long with depressive and amnestic disorders. The Court does not read the ALJ to reject Dr. Gange's opinion outright; rather, fairly read, the ALJ's decision rejects the level of severity found by Dr. Gange, as compared to that detailed in Dr. Henry's report. For the reasons explained above, there is no error here.